## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| JAMES BUCKLEY, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| MOLONEY SECURITIES CO., INC. | ) ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

James Buckley ("Buckley" or "Plaintiff") respectfully submits the following in support of his Class Action Complaint against Moloney Securities Co., Inc. ("Moloney" or "Defendant"):

## FACTUAL SUMMARY

This case concerns L Bonds offered by GWG Holdings, Inc. through Moloney and other broker-dealers. GWG sold L Bonds to retail investors and then used the sale proceeds from the L Bonds to invest in a highly speculative, untested "alternative asset" company known as Beneficient. Ultimately, GWG failed because of an overwhelming debt burden and the inability of Beneficient to cover GWG's losses. Retail investors like Buckley and members of the proposed Class suffered the consequences of GWG's horrible investment.

Moloney knew or should have known about GWG's risky conduct, and it should not have sold the L Bonds to retail investors. Retail investors who put their money in corporate bonds are seeking predictability and safety—not to have their money passed through to a highly speculative "alternative asset" startup company.

GWG disclosed its conduct in multiple filings with the Securities and Exchange Commission. In fact, it repeatedly warned investors about the risky nature of its relationship with

Beneficient. GWG stated, "You should consider carefully the following risk factors related to the Beneficient Transactions in evaluating [GWG] and our business."[1] Had Moloney heeded this warning and conducted even the most basic due diligence concerning the L Bonds, it would have discovered that retail investor funds (like those from Buckley and the proposed Class) were being used to fuel a risky startup company.

As set forth herein, the GWG L Bonds were *per se* unsuitable for retail investors who relied on Moloney for sound investment decisions. In failing to suss out the dangerous and speculative nature of GWG's conduct, Moloney failed its clients by offering them an unsound and unfit product. In support of his Complaint, Buckley respectfully submits the following:

## PARTIES

1.      Plaintiff James Buckley is a citizen and resident of Kansas City, Missouri, and was throughout the relevant time period at issue in this case.

2.      Defendant Moloney Securities Co., Inc. is a Missouri corporation with its principal place of business in St. Louis County, Missouri.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Classes defined herein contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 15 U.S.C. § 4 and under 28 U.S.C. §§ 1331, 1337.

---

[1]      GWG Holdings, Inc. 2019 Form 10-K (filed March 27, 2020) at p. 26.

4.      Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. §1391(b), (c), and (d). Defendant transacted business, was found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

<strong>FACTUAL ALLEGATIONS</strong>

<strong>GWG Holdings Background and L Bonds</strong>

5.      In its 2017 Form 10-K (dated March 29, 2018), GWG stated that it was "a financial services company committed to transforming the life insurance industry with disruptive and innovative products and services." In short, on the secondary market, GWG would purchase life insurance policies from consumers, paying them less than the face amount of the policy and then collecting the policy benefits when the consumer passed away. According to GWG:

> We purchase these policies at a discount to the face value of the policy's benefit and continue to pay the premiums in order to collect the policy benefits. The secondary market opportunity exists because the incumbent life insurance industry offers consumers inadequate surrender values for the policies they sell.

GWG Holdings, Inc. Form 10-K (for FY ending December 31, 2017) (dated March 29, 2018) at p. 1 ("2017 Form 10-K").

6.      To help finance its purchase of these life insurance policies on the secondary market, GWG began publicly offering and selling L Bonds in January 2012 under the name "Renewable Secured Debentures." GWG re-named the instruments "L Bonds" in January 2015. 2017 Form 10-K at F-15 (note 8).

7.      As of December 2017, the principal amount of L Bonds outstanding was $461,427,000.

8.     GWG L Bonds were illiquid investments.

9.     Currently no market for GWG L Bonds exists and no such market is expected to develop.

10.     GWG L Bonds were not rated by any bond rating agency, which made them unusual in the corporate bond environment.

11.     By its own admission, GWG "critically rel[ied] on debt financing for our business." This debt had two primary components:

- GWG's subsidiary had a "senior secured term with LNV Corporation" with an outstanding balance in December 2017 of $222.5 million, and

- (2) GWG's outstanding balance of L Bonds (approximately $460 million).

GWG relied on this debt "to enable us to purchase a large and diversified portfolio of life insurance policies and pay the attendant premiums and costs of maintain the portfolio . . . ." 2017 Form 10-K at p. 16.

12.     Regarding the debt related to the L Bonds, GWG warned that "[t]he collateral granted as security for our obligations under the L Bonds may be insufficient to repay the indebted upon an event of default." 2017 Form 10-K at pp. 23–24. All of GWG's life insurance assets were held in its subsidiary. GWG explained that "all of those assets serve as collateral security for our obligations under our senior credit facility to [to LNV Corporation]," meaning that L Bond holders "risk the possibility that the collateral security that has been granted for our obligations under the L Bonds may be insufficient to repay holders upon an event of default." *Id.*

13.     In other words, GWG's primary asset—its portfolio of life insurance policies—was being used as collateral for the security agreement with LNV Corporation; it was ***not*** being used as security for the L Bonds.

4

**GWG's Collapse and Fall Out for L Bond Investors**

14.     GWG's collapse and the corresponding losses for L Bond investors is well documented.

15.     The plan was simple: "GWG would raise the money. Beneficient would put it to work. . . . Instead, it kicked off what became one of the biggest financial blowups to strike retail investors in years."[2]

16.     GWG's sale of L Bonds climbed through 2020, eventually reaching $1.3 billion in sales.

17.     During this same time, GWG invested $230 million in Beneficient—all of these transfers to Beneficient were disclosed and publicly available to any broker-dealer willing to search for them. Moloney failed to do so.

18.     When Beneficient failed to satisfactorily perform—a likelihood that was apparent from even the earliest public filings—GWG defaulted on its L Bond obligations in 2022. GWG's default left Buckley and members of the proposed Class with worthless bonds and no value for their investment.

**Buckley's Purchase of L Bonds from Moloney**

19.     Buckley is 84 years old and was a client of Moloney Securities. He is a retired police officer.

20.     In 2019, he purchased $100,000 worth of GWG L Bonds with a maturity date of September 30, 2026.

_____

[2]     Alexander Gladstone, *$2 Billion Default Followed Warnings to Everyone but Investors*, The Wall Street Journal (July 28, 2023).

21.     The GWG L Bonds were *per se* unsuitable for any retail investor such as Mr. Buckley.

22.     Buckley was overconcentrated in GWG L Bonds; more than 10% of his investable assets were tied up in this investment.

23.     After GWG's default, Buckley's L Bonds have a $0 market value.

### Beneficient was a Startup Venture

24.     In 2017, Beneficient was functionally a startup with no track record. Although it had existed since 2003, it had not been considered an "alternative asset" business until 2017. Nonetheless, GWG made significant loans to and invested significant capital in it—all for the unfulfilled hope of profitable returns, presumably to enrich GWG with the increased value of its Beneficient common stock holdings.

25.     GWG warned investors about Beneficient's startup status. Several disclosures pointed to the nascent stages of Beneficient's operations, including:

- The fact that as of the Master Exchange Agreement in 2018, Beneficient had not received any of its regulatory trust charters, and

- "Beneficient ***may be unable to operate its business successfully***" and Beneficient "***plans*** to provide to mid-to-high net worth individuals . . . fund and trust administration, retirement funds and insurance services for covering risks attendant to owning or managing alternative assets."

2017 Form 10-K at pp. 10, 27 (emphasis added).

26.     This same warning—that Beneficient may be unsuccessful—was carried forward in all of GWG's annual reports during the relevant time period.

6

27.     Going forward, GWG's annual reports provided additional warnings about the upstart nature of Beneficient and the absence of a track record for the company. These subsequent disclosures revealed that little, if any, progress had been made in Beneficient's business development. For example, the 2018 Form 10-K (filed July 9, 2019) stated:

- ***Beneficient still didn't have regulatory approval:*** "Beneficient has applied for trust company charters . . . . Because Beneficient's current business plans are based in part on obtaining regulatory approval to operate as regulated trust companies, a failure to do so may materially and adversely impact its financial performance and prospects, which would likely decrease the value of the [] common units and commercial loan receivable [GWG] hold[s] and adversely affect [GWG's] ability to execute our growth strategies." *Id.* at 9, 26

- ***GWG still didn't have any control over Beneficient:*** even though GWG owned 89.9% of Beneficient's common units, it still had "limited or no ability to influence [the company's] management decisions regarding its business. *Id*. at 24

- ***Beneficient had the right to take on superior debt:*** given its autonomy, Beneficient could load up with more debt and could "incur additional indebtedness ranking senior to [GWG's] Commercial Loan"—a loan of over $400 million. *Id.* at 26

- ***And if Beneficient defaulted, GWG would suffer:*** "As a significant holder of Beneficient indebtedness, a payment default . . . would likely have a corresponding negative impact on the value of [GWG's] assets . . . ." *Id*. 26

28.     While it was clear that Beneficient was a new operation, GWG laid it out in explicit, direct terms:

> ***Beneficient does not have any operating history for its new business***

[] Beneficient's business plan represents a new phase in its development, and Beneficient does not have operating history under its current business plan. Additionally, Beneficient's proposed trust company subsidiaries have no operating history.

In general, companies that seek to implement these kinds of business plans present substantial business and financial risks and uncertainties.

2018 Form 10-K at p. 30 (emphasis in original). Thus, GWG explicitly warned investors: Beneficient's business plan—the same business plan used to justify GWG's $400 million investment in Beneficient—was new and untested.

29.     In the same 2018 Annual Report, GWG again did not mince words about Beneficient-related warnings concerning forward-looking statements, stating that risks and uncertainties included:

- the valuation of assets reflected on [GWG's] financial statements, including our equity method investment in Beneficient and our financing receivables from Beneficient;

- [GWG's] ability to realize the anticipated benefits from our strategic relationship with Beneficient;

- Beneficient's financial performance and ability to execute on its business plan; and

- [GWG's] ability to obtain accurate and timely financial information from Beneficient.

2018 Form 10-K at pp. 41–42.

<strong>GWG's Transactions with Beneficient</strong>

<strong><em>GWG's 2018 Master Exchange Agreement with Beneficient</em></strong>

30.     Despite knowing that Beneficient was functionally a new upstart company with no operations history, in 2017 and 2018 GWG undertook a significant investment in Beneficient—an investment funded by retail investors for L Bonds.

31.     In January 2018, GWG announced a new "Master Exchange Agreement" with Beneficient Company Group, L.P. and other additional entities, including a group of entities known as "Seller Trusts." *See* GWG Holdings, Inc. Form 8-K (dated January 12, 2018).

32.     Under the Master Exchange Agreement, GWG received approximately 40 million common unit shares of Beneficient from the Seller Trusts, and $150 million in cash from MHT SPV (one of the additional entities).

33.     In return, GWG provided the following to the Seller Trusts: GWG common stock, L Bonds (in an amount equal to the aggregate amount of common stock of GWG Holdings provided), and $150 million in cash (the same amount provided by MHT SPV to GWG). GWG also provided common stock to MHT SPV.

34.     For Beneficient, GWG provided a commercial loan "in a principal amount of up to $400 million to facilitate Beneficient's build-out of its suite of liquidity products." *Id.* at p. 1.

35.     According to GWG, the following chart provides a visual description of the Master Exchange Agreement:



GWG Holdings Schedule 14C Information (dated February 9, 2018).[3]

36.     In its Form 10-K for 2017 (filed in March 2018), GWG disclosed several risks related to the Master Exchange Agreement, particularly as it related to Beneficient's role in the transaction. For example:

- Beneficient "may be unable to operate its business successfully, which would negatively impact is ability to generate distributable cash flow and increase the value of its common units"—the same common units that GWG received as part of the Master Exchange Agreement. 2017 Form 10-K at p. 27.

- "Because common units of Beneficient will represent a significant percent of our assets, the impact on our financial statements of Beneficient's financial performance may be material." *Id.* at p. 28.

- GWG would have "limited or no ability to influence Beneficient's management's decisions regarding its business" even though GWG "will own a significant percentage of Beneficient's outstanding common units upon consummation of the [Master] Exchange Transaction." *Id.* at p. 28.[4]

37.     The Master Exchange Agreement closed on December 28, 2018. Consistent with the diagram above in paragraph [34], the following transactions occurred:

───────────────────────

[3]     GWG Life is a wholly-owned subsidiary of GWG Holdings.

[4]     It was anticipated that GWG would own 82% of the issued and outstanding common units in Beneficient, yet GWG would "have limited or no ability to influence Beneficient's management's decisions regarding its business." 2017 Form 10-K at p. 12.

- GWG Life made a commercial loan to Beneficient for $200 million—the repayment terms included a transfer of approximately $40 million in value in Beneficient stock to GWG, and a promissory note executed by Beneficient for the remaining approximately $160 million balance;

- GWG issued over $400 million in L Bonds to the Seller Trusts; and

- GWG issued to the Seller Trusts over 27 million shares of its common stock.

GWG Holdings, Inc. Form 10-K (for FY ending December 31, 2018) (filed July 9, 2019) at pp. 2-3 ("2018 Form 10-k").

### GWG's Expanded "Strategic Relationship" with Beneficient—the 2019 Purchase and Contribution Agreement

38.     Just months after closing the Exchange Purchase Agreement in December 2018, GWG doubled down on its relationship with Beneficient. According to GWG:

> In the second quarter of 2019, we completed an expansion of the strategic relationship with Beneficient, which was a transformational event for both organizations . . . GWG and Beneficient intend to collaborate extensively and capitalize on one another's capabilities, relationships and services.

2018 Form 10-K at p. 3.

39.     This expansion came in the form of a Purchase and Combination Agreement between GWG and Beneficient; it was executed and closed in April 2019—just four months after the close of the Exchange Purchase Agreement.

40.     As part of the Purchase and Combination Agreement:

- GWG and its executives sold common stock to Beneficient-related entities;

- Beneficient paid $25 million to GWG executives who sold their shares; and

- GWG contributed its remaining shares to an LLC owned by certain owners of Beneficient;

2018 Form 10-K at pp. 3–4.

41.     By this point in the relationship between GWG and Beneficient, the Seller Trusts—organizations affiliated with Beneficient and its owners—owned approximately 78.6% of GWG's stock. *Id.* at p. 27.

42.     The metrics underpinning the Purchase and Combination Agreement relied heavily on "BEN Estimates." BEN Estimates were calculations formulated by Beneficient to show the value of the potential market for its services. BEN Estimates included data from industry reports and private-equity databases, but also relied on "proprietary assumptions and calculations" created by Beneficient. Even though Beneficient was a company with no operating history, according to these BEN Estimates—which were created in part using a secret formula devised by Beneficient—the potential market demand for its speculative services exceeded $20 billion in 2018. 2018 Form 10-K at p. 5.[5]

### *GWG and Beneficient Fully Combine*

43.     After the transactions listed above, the objective was achieved: GWG and Beneficient were significantly intertwined on several fronts, including financing arrangements (mainly money flowing from GWG to Beneficient in exchange for the startup company's stock),

---

[5]     This same BEN Estimate assertion—and the same formula—were reiterated in subsequent filings. *See* 2019 Form 10-K (filed March 27, 2020) at p. 6.

stock ownership, and control (primarily with Beneficient having the right to control GWG—not vice versa).

44.     GWG's 2019 Annual Report, filed in March 27, 2020, heralded this arrangement: it was no longer a secondary market life insurance company; instead GWG had become an "alternative asset" company. According to GWG:

> We are a financial services company committed to transforming the alternative asset industry with disruptive and innovative products and services. In 2018 and 2019, GWG consummated a series of transactions [] with Beneficient that has resulted in a ***significant reorientation*** of our business and capital allocation strategy towards an expansive and diverse exposure to alternative assets. As part of this ***reorientation***, we also changed our Board of Directors and executive management team.

2019 Form 10-K (filed March 27, 2020) at p. 1 (emphasis added).

45.     As part of this "reorientation," GWG also announced that it was abandoning the secondary life insurance business—the same business line that formed the core of the company just a few years earlier. *Id.* ("[W]e do not anticipate purchasing additional life insurance policies in the secondary market and have increased capital allocated toward pivoting liquidity to a broader range of alternative assets . . . .").

46.     But even at this point of "reorientation," Beneficient remained an untested entity. GWG stated that "Beneficient was formed in 2003 but began its alternative asset business in September 2017" without explaining what the company did during the 14-year time lapse. It also

13

stated that Beneficient "plans to operate" three entities—the same three entities identified in earlier SEC filings submitted by GWG. *Id.* at p. 2.

47.    The 2019 Form 10-K also announced yet another Beneficient related transaction: the Investment Agreement. Under this Agreement, GWG transferred another $79 million to Beneficient in exchange for 666,667 common stock units of Beneficient. This represented the second significant cash infusion to Beneficient from GWG, all at the same time that Beneficient was paying GWG-related executives $25 million in cash for their GWG stock. *Id.* at p. 49.

48.    As part of the Investment Agreement, GWG was issued more stock valued at $319 million, which was held by "Related Unitholders"—all of which were either a founder or director of GWG and/or Beneficient. *Id.* at p. 49.

49.    Finally, GWG "obtained control of [Beneficient] and began reporting the results of [Beneficient] and its subsidiaries on a consolidated basis beginning on [] December 31, 2019." *Id.* at p. 5.

50.    During this time, GWG continued to rely heavily on debt, including its still-outstanding debt facility with LNV Corporation; the balance in December 2019 was $184.6 million. *Id.* at p 19 ("[GWG's] business model is based on the acquisition of alternative assets financed primarily through debt financing.").

51.    Aside from L Bonds sold to retail investors, GWG still had significant principal owing on the L Bonds issued to Seller Trusts. That balance was approximately $366.9 million as of December 2019. *Id.* at p. 22.

52.    At the same time, Beneficient remained significantly in debt to GWG, to the tune of $197.4 million. *Id.* at p. 26. And in May 2019, GWG agreed to loan an additional $65 million

"to six common law trusts established a part of alternative asset financings extended by a subsidiary of Beneficient." *Id.*

53.     All the while, GWG's loans to Beneficient remained subordinate to the debt and other liabilities of Beneficient, meaning GWG would get paid only *after* other creditors of Beneficient. *Id.*

54.     GWG's entanglement with Beneficient—a relationship funded by retail investors like Buckley and the proposed Class—is astonishing given the number of red flags surrounding Beneficient's operations. For example:

- Beneficient's plan for liquidity solutions—the same market that BEN Estimated to be $20 billion—were not being well-received at the time. "[T]o date, [Beneficient's] originations of liquidity products have been transacted with a limited number of family offices, funds-of-funds and institutions. These types of clients, specifically funds-of-funds and institutions, may not represent the target market of [Beneficient's] liquidity products of the future." 2019 Form 10-K at p. 26. In other words, Beneficient wasn't gaining ground in its key market: mid to high-net-worth individuals.

- Beneficient had experienced "significant delays" in obtaining its trust company charters—the same charters flagged as a concern in GWG's 2017 reports. *Id.* at p. 27.

- Beneficient's management and auditors "identified several material weaknesses in Beneficient's internal controls as of December 31, 2018." *Id.* at p. 29. In fact, part of

the reason GWG was unable to timely file its annual report "was due, in part, to a delay in [GWG] obtaining financial information from Beneficient." *Id.* at p. 30.[6]

- Even by early 2020, Beneficient still did "not have significant operating history under its current business plan." *Id.* at p. 31.

55.    In all, GWG's 2019 Annual Report identified over sixteen risks related to its "strategic relationship" with Beneficient, and an additional thirty-six risks related solely to Beneficient's operations.

*Summary*

56.    Thus, within the short span of two calendar years (2018 and 2019), GWG had pumped significant investments into an untested, unknown "alternative asset" startup. These investments included:

| AGREEMENT | DATE | GWG FUNDS TO BENEFICIENT ENTITIES |
|---|---|---|
| Master Exchange Agreement | December 2018 | $200 million loan $400 million in L Bonds |
| Purchase & Contribution Agreement | May 2019 | Share transfer |
| Stock purchase | December 2019 | $79 million for Beneficient stock |

_____

[6]    Like Beneficient, GWG itself reported material weaknesses in its 2018 annual audit—another red flag for Moloney and other broker-dealers. 2019 Form 10-K at p. 30.

57.    Yet the bulk of these investments were funded by retail investors—retirees and other investors who had no idea their funds were being used to prop up an "alternative asset" investment company with no operations history or track record.

58.    As The Wall Street Journal said, the scheme that ensued "became one of the biggest financial blowups to strike retail investors in years" *See* fn.2, *supra*.

59.    But GWG's conduct was out in the open—any broker-dealer selling L Bonds could have discovered the risky nature of the investment if they had looked. Indeed, red flags were flying everywhere about Beneficient's startup nature and the risks associated with GWG's persistent investment in it.

**Moloney's Failures**

60.    Despite these red flags, Moloney failed to detect the harm and continued selling L Bonds to its retail investor clients throughout the relevant time period.

61.    Moloney knew or should have known about the risky investment in GWG.

62.    Moloney knew or should have known about the risky investment in L Bonds.

63.    Moloney should have exercised basic due diligence to discover the risks associated with GWG and L Bonds.

64.    Based on these risks, Moloney should not have offered L Bonds to retail investors at all. The L Bonds were *per se* unsuitable for retail investors.

65.    In an enforcement action against a different broker, the SEC recognized that broker-dealers have an obligation to retail investors and that promoting and offering GWG L Bonds to retail investors breached that obligation. *See U.S. Sec. and Exch. Comm'n v. W. Int'l. Sec., Inc. et al.*, No. 22-04119 (C.D. Cal.).

17

66.    Moloney stands in the same position: it failed to recognize the risks associated with GWG's L Bonds and improperly promoted them and sold them to retail investors.

67.    To remedy Moloney's misconduct, Buckley brings this matter on behalf of himself and other retail investors.

## CLASS ACTION ALLEGATIONS

68.    Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein.

69.    Plaintiff brings this case on behalf of himself, and as a representative of the following class:

> **All retail investors who purchased GWG L Bonds from**
> **Moloney Securities Company, Inc.**
> **between January 12, 2018 and the present.**

70.    Plaintiff also brings this case on behalf of himself, and as a representative of the following subclass (hereinafter referred to as the "Overconcentration Subclass"):

> **All retail investors who purchased GWG L Bonds from**
> **Moloney Securities Company, Inc.**
> **between January 12, 2018 and the present,**
> **and the GWG L Bonds represented more than**
> **ten percent (10%) of the investor's investable assets.**

71.    The Class and Overconcentration Subclass will be jointly referred to as "Classes."

72.    Excluded from the Classes are two categories of individuals: (1) investors pursuing individual cases against Moloney Securities related to the GWG L Bonds, and (2) non-retail investors such as institutions, family offices, and funds-of-funds.

73.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

74.     **Numerosity.**   Class members are so numerous that their individual joinder is impracticable. Upon information and belief, the Classes contain thousands of retail investors. At one point, the outstanding principal of GWG's L Bonds exceeded $1 billion, meaning there are at a minimum thousands of retail investors who fall within the Class definitions. The precise number of Class members and their addresses can be obtained from information and records in Defendant's possession and control. Class members may be notified of the pendency of this action by mail or other appropriate methods.

75.     **Existence and Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting only individual Class members.  These common legal and factual questions, each of which also may be certified in the alternative under Rule 23(c)(4), include the following:

a.     Whether Moloney had duties to Plaintiff and the Classes as alleged herein;

b.     Whether Moloney violated its duties to Plaintiff and the Classes as alleged herein;

c.     Whether the GWG L Bonds are *per se* unsuitable for retail investors;

d.     Whether (and when) Moloney knew or should have known about the risks associated with GWG L Bonds;

e.     Whether Moloney failed to exercise appropriate due diligence to discover the risks associated with GWG L Bonds;

f.     Whether Moloney failed to train, manage, and supervise its financial advisors offering GWG L Bonds to retail investors;

g.     Whether this case may be maintained as a class action under Federal Rule of Civil Procedure 23;

h.     Whether and to what extent Class members are entitled to equitable relief; and

i.      Whether and to what extent Class members are entitled to damages and other monetary relief.

76.     **Typicality.**  Plaintiff's claims are typical of the Classes because he was a client of Moloney, he purchased the investment vehicle at issue (GWG L Bonds), and he was a retail investor. Furthermore, his investments were overconcentrated in GWG L Bonds making him typical of the Overconcentration Subclass.

77.     **Adequacy of Representation.**  Plaintiff will fairly and adequately protect the interests of Classes. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Classes.

78.     Additionally, the Classes may be certified because:

*       ***Risk of Inconsistency.***  The prosecution of separate actions by individual Class members would create a risk of (1) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant; or (2) adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

*       ***Superiority.***  A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims

against Defendant. Thus, it would be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation also would increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

79.    Finally, in the alternative, this action may be brought or maintained as a class action with respect to particular issues, including but not limited to the common questions of law and fact identified above.

## TOLLING

80.    Plaintiff and the Classes could not reasonably have discovered the facts constituting Moloney's various violations until after GWG defaulted on its L Bond obligations in 2022. Accordingly, the claims of Plaintiff and the Class did not accrue until 2022.

## COUNT I
### Breach of Fiduciary Duty
### (Brought by Plaintiff and the Classes Against Moloney)

81.    Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein. Plaintiff brings this claim on behalf of himself and the Classes against Moloney.

82.    In Missouri, broker-dealers and their agents owe their clients a fiduciary duty as to each financial transaction which they recommend. They have a duty to stay abreast of market

21

changes. *Faron v. Waddell & Reed, Inc.*, 930 S.W.2d 508, 511 (Mo. Ct. App. 1996) (quoting *State ex rel. PaineWebber v. Voorhees*, 891 S.W.2d 126, 129-30 (Mo. 1995)).

83.    Moloney and its agents failed to adhere to these duties vis-à-vis the GWG L Bonds.

84.    Moloney failed to act as a reasonably prudent adviser representative in that:

a.    Moloney knew or should have known through appropriate due diligence that the GWG L Bonds were highly risky and closely dependent on the performance of an "alternative asset" startup company with no regulatory charters or track record of performance;

b.    Nonetheless and despite this knowledge, Moloney offered for sale the GWG L Bonds despite their obvious and apparent risky nature; and

c.    Moloney failed to stay abreast of GWG's public statements and failed to appropriately account for whether GWG L Bonds were appropriate for retail investors like Plaintiff and the Classes.

d.    Plaintiff and Class members were damaged by Moloney's breach.

## COUNT II
### Breach of the Duty of Suitability
### (Brought by Plaintiff and the Classes Against Moloney)

85.    Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein. Plaintiff brings this claim on behalf of himself and the Class against Moloney.

86.    Moloney owed Plaintiff and the Class a duty of suitability as to all the investments which were sold.

87.    Moloney was required to have a reasonable basis to believe, based on reasonable diligence, that the sale of GWG L Bonds was suitable for at least some investors.

88.    Reasonable diligence must provide the firm with an understanding of the potential risks and rewards of the recommended security.

89.    Here, Moloney did not engage in reasonable due diligence.

90.    Moloney did not have an understanding of the potential risks and rewards of the GWG L Bonds.

91.    Moloney's conduct regarding the sale of the GWG L Bonds was a breach of the duty of suitability, particularly where the L Bonds were tied to a risky "alternative asset" startup company with no performance record.

92.    The breach is particularly acute where the L Bonds were sold to retail investors.

93.    Plaintiff and the Class have been substantially damaged by Moloney's breach.

**COUNT III**
**Failure to Supervise / Negligent Supervision**
**(Brought by Plaintiff and the Classes Against Moloney)**

94.    Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein. Plaintiff brings this claim on behalf of himself and the Classes against Moloney.

95.    Moloney, as a broker-dealer, had a duty to reasonably supervise financial advisors in its sale of GWG L Bonds under Missouri law, as well as the rules of the Financial Industry Regulatory Authority (FINRA), including FINRA Rule 3110.

96.    Moloney failed to reasonably supervise its financial advisors in the offering and sale of GWG L Bonds.[7]

---

[7]    Moloney has been disciplined previously for failing to supervise its financial advisors in the sale and offering of highly speculative investments. *See* Financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No. 2015046315102 (May 4, 2020).

97.     Moloney's advisors overconcentrated Plaintiff and other customers' accounts in GWG L Bonds, putting too much of their net worth in one place. This conduct was widespread yet Moloney did not stop it.

98.     Plaintiff and the Classes have been substantially damaged by Moloney's failure to reasonably supervise its financial advisors vis-à-vis the offering and sale of GWG L Bonds.

**COUNT IV**
**Negligence**
**(Brought by Plaintiff and the Classes Against Moloney)**

99.     Plaintiff incorporates by reference and re-alleges all paragraphs previously alleged herein. Plaintiff brings this claim on behalf of himself and the Class against Moloney.

100.    Moloney knew or should have known that the GWG L Bonds should not be sold to retail investors such as Plaintiff and other class members.

101.    Moloney knew or should have known that customer assets should not be overconcentrated in GWG L Bonds.

102.    Moloney violated its duty by its negligent acts and conduct as set forth above.

103.    Moloney's conduct also violated FINRA Rule 2111; and the applicable "Best Interest" Regulation (Reg BI), codified at 17 CFR § 240.151-1(a)(1).

104.    Moloney should have reasonably foreseen the damages to Plaintiff and the Class prior to those damages occurring.

105.    As a direct and proximate result of Moloney's negligence, Plaintiff and the Classes have been damaged.

**JURY DEMAND**

Plaintiff, on behalf of himself and the proposed Classes, hereby demands a jury trial on all issues triable to a jury.

DATE: January 8, 2024                    Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

_____*/s/ Eric L. Dirks*_____
Eric L. Dirks, MO Bar No. 54921
Matthew L. Dameron, MO Bar No. 52093
(Admission Pending)
Clint Mann, MO Bar No. 70212
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 945-7110
eric@williamsdirks.com
matt@williamsdirks.com
cmann@williamsdirks.com

-and-

Jared A. Rose, MO Bar No. 60128
**THE LAW OFFICE OF JARED A. ROSE**
919 West 47th Street
Kansas City, Missouri 64112
Telephone: (816) 221-4335
Email: jared@roselawkc.com

***Attorneys for Plaintiff and the Proposed Class***